# EXHIBIT "A"

MACDONALD RUDY
O'NEILL & YAMAUCHI, LLLP, LLP

FIRST CIRCUIT COURT
STATE OF HAWAII
FILED

2015 APR 13  PM 3: 57

H. CHING
CLERK

MICHAEL D. RUDY        5105-0
CHERYL R. NG           8598-0
PAUL A. C. HIGA        9557-0
1001 Bishop Street, Suite 2350
Honolulu, Hawaii 96813
Telephone No. (808) 523-3080
Facsimile No.  (808) 523-0759

Attorneys for Plaintiffs

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

CIUFO HOLDING CO., LLC; JASON
CIUFO, LESLIE ANN CIUFO, AND
JOHN T. LAGNESE, CO-TRUSTEES OF
THE JASON CIUFO TRUST DATED
DECEMBER 24, 1998; JASON CIUFO,
LESLIE ANN CIUFO, AND JOHN T.
LAGNESE, CO-TRUSTEES OF THE
JASON CIUFO FAMILY TRUST
DATED DECEMBER 24, 1998; JESSICA
CIUFO, JASON CIUFO, AND JOHN T.
LAGNESE, CO-TRUSTEES OF THE
JESSICA CIUFO FAMILY TRUST
DATED DECEMBER 24, 1998;
KENNETH CIUFO, LESLIE ANN
CIUFO, AND JOHN T. LAGNESE, CO-
TRUSTEES OF THE KENNETH CIUFO
TRUST II DATED DECEMBER 24,
1998; KENNETH CIUFO, LESLIE ANN
CIUFO, AND JOHN T. LAGNESE, CO-
TRUSTEES OF THE KENNETH CIUFO
FAMILY TRUST DATED DECEMBER
24, 1998; KENNETH CIUFO, JR.,
KENNETH CIUFO, AND JOHN T.
LAGNESE, CO-TRUSTEES OF THE
KENNETH CIUFO, JR. FAMILY
TRUST DATED DECEMBER 24, 1998;
LESLIE ANN CIUFO, KENNETH
CIUFO, AND JOHN T. LAGNESE, CO-

CIVIL NO.  **15-1-0667-04**  ∀ L C

COMPLAINT; EXHIBIT "A";
SUMMONS

I do hereby certify that this is a full, true and
correct copy of the original on file in this office.

Clerk, Circuit Court, First Circuit

EXHIBIT "A"

TRUSTEES OF THE LESLIE ANN
CIUFO TRUST II DATED DECEMBER
24, 1998; LESLIE ANN CIUFO,
KENNETH CIUFO, AND JOHN T.
LAGNESE, CO-TRUSTEES OF THE
LESLIE ANN CIUFO FAMILY TRUST
DATED DECEMBER 24, 1998,

                Plaintiff,

    vs.

ADMOR GROUP, INC.; ADMOR
DISTRIBUTORS CORP.; ADMOR
HVAC PRODUCTS, INC.; JOHN DOES
1-10, JANE DOES 1-10, DOE
PARTNERSHIPS, CORPORATIONS, or
ENTITIES 1-20,
                Defendants.

## COMPLAINT

Come now JASON CIUFO, LESLIE ANN CIUFO, and JOHN T. LAGNESE, Co-Trustees of the Jason Ciufo Trust dated December 24, 1998; JASON CIUFO, LESLIE ANN CIUFO, and JOHN T. LAGNESE, Co-Trustees of the Jason Ciufo Family Trust dated December 24, 1998; JESSICA CIUFO, JASON CIUFO, and JOHN T. LAGNESE, Co-Trustees of the Jessica Ciufo Family Trust dated December 24, 1998; KENNETH CIUFO, LESLIE ANN CIUFO, and JOHN T. LAGNESE, Co-Trustees of the Kenneth Ciufo Trust II dated December 24, 1998; KENNETH CIUFO, LESLIE ANN CIUFO, and JOHN T. LAGNESE, Co-Trustees of the Kenneth Ciufo Family Trust dated December 24, 1998; KENNETH CIUFO, JR., KENNETH CIUFO, and JOHN T. LAGNESE, Co-Trustees of the Kenneth Ciufo, Jr. Family Trust dated December 24, 1998; LESLIE ANN CIUFO, KENNETH CIUFO, and JOHN T. LAGNESE, Co-Trustees of the Leslie Ann Ciufo Trust II dated December 24, 1998; LESLIE ANN CIUFO, KENNETH CIUFO, and JOHN T. LAGNESE, Co-Trustees of the Leslie Ann Ciufo Family Trust dated December 24, 1998; and Union Leasing Corp., by and through their attorneys, MacDonald Rudy O'Neill & Yamauchi, a Limited Liability Law Partnership, LLP, who bring this Complaint for damages and other claims against the above-named Defendants ADMOR GROUP, INC.; ADMOR DISTRIBUTORS CORP.; ADMOR HVAC PRODUCTS, INC.; JOHN DOES 1-10, JANE DOES 1-10, DOE PARTNERSHIPS, CORPORATIONS, or ENTITIES 1-20, and allege as follows.

### I.   NATURE OF ACTION

1.    This action is brought under the equitable principle of unjust enrichment to recover principal and interest on loans made by Plaintiff Ciufo Holding Co., LLC to

1

Defendants and interest on amounts improperly withheld from Plaintiff Trusts for the benefit of Defendants.

## II. JURISDICTION AND VENUE

2. This Court has general jurisdiction over the civil claim asserted herein pursuant to Hawaii Revised Statutes Section 603-21.5.

3. Venue is proper here pursuant to Hawaii Revised Statutes Section 603-36 because the claims for relief arose in this judicial circuit and the Defendants have their principal places of business in this judicial circuit.

## III. PARTIES

4. Plaintiff CIUFO HOLDING CO., LLC ("Ciufo Holding") is and was, at all times relevant and material herein, a limited liability company organized and existing under the laws of the State of Hawaii, with its principal place of business in the City and County of Honolulu, State of Hawaii.

5. Plaintiffs JASON CIUFO, LESLIE ANN CIUFO, and JOHN T. LAGNESE are the Co-Trustees of the Jason Ciufo Trust dated December 24, 1998 (the "Jason Trust"), which has and had, at all times relevant and material herein, its principal place of administration in the City and County of Honolulu, State of Hawaii.

6. Plaintiffs JASON CIUFO, LESLIE ANN CIUFO, and JOHN T. LAGNESE are the Co-Trustees of the Jason Ciufo Family Trust dated December 24, 1998 (the "Jason Family Trust"), which has and had, at all times relevant and material herein, its principal place of administration in the City and County of Honolulu, State of Hawaii.

7. Plaintiffs JESSICA CIUFO, JASON CIUFO, and JOHN T. LAGNESE are the Co-Trustees of the Jessica Ciufo Family Trust dated December 24, 1998 (the "Jessica Family

2

Trust"), which has and had, at all times relevant and material herein, its principal place of administration in the City and County of Honolulu, State of Hawaii.

8.      Plaintiffs KENNETH CIUFO, LESLIE ANN CIUFO, and JOHN T. LAGNESE are the Co-Trustees of the Kenneth Ciufo Trust II dated December 24, 1998 (the "Kenneth Trust II"), which has and had, at all times relevant and material herein, its principal place of administration in the City and County of Honolulu, State of Hawaii.

9.      Plaintiffs KENNETH CIUFO, LESLIE ANN CIUFO, and JOHN T. LAGNESE are the Co-Trustees of the Kenneth Ciufo Family Trust dated December 24, 1998 (the "Kenneth Family Trust"), which has and had, at all times relevant and material herein, its principal place of administration in the City and County of Honolulu, State of Hawaii.

10.     Plaintiffs KENNETH CIUFO, JR., KENNETH CIUFO, and JOHN T. LAGNESE are the Co-Trustees of the Kenneth Ciufo, Jr. Family Trust dated December 24, 1998 (the "Kenneth Jr. Family Trust"), which has and had, at all times relevant and material herein, its principal place of administration in the City and County of Honolulu, State of Hawaii.

11.     Plaintiffs LESLIE ANN CIUFO, KENNETH CIUFO, and JOHN T. LAGNESE are the Co-Trustees of the Leslie Ann Ciufo Trust II dated December 24, 1998 (the "Leslie Trust II"), which has and had, at all times relevant and material herein, its principal place of administration in the City and County of Honolulu, State of Hawaii.

12.     Plaintiffs LESLIE ANN CIUFO, KENNETH CIUFO, and JOHN T. LAGNESE are the Co-Trustees of the Leslie Ann Ciufo Family Trust dated December 24, 1998 (the "Leslie Family Trust"), which has and had, at all times relevant and material herein, its principal place of administration in the City and County of Honolulu, State of Hawaii.

3

13.     Jason Ciufo, individually and in all of his fiduciary capacities as noted above, will be referred to hereinafter as "Jason."

14.     Jessica Ciufo, individually and in all of her fiduciary capacities as noted above, will be referred to hereinafter as "Jessica."

15.     Kenneth Ciufo, individually and in all of his fiduciary capacities as noted above, will be referred to hereinafter as "Kenneth."

16.     Kenneth Ciufo, Jr., individually and in all of his fiduciary capacities as noted above, will be referred to hereinafter as "Kenneth Jr."

17.     Leslie Ann Ciufo, individually and in all of her fiduciary capacities as noted above, will be referred to hereinafter as "Leslie."

18.     Jason, Jessica, Kenneth, Kenneth Jr., and Leslie will be referred to, collectively, hereinafter as the "Ciufos."

19.     John T. Lagnese, individually and in all of his fiduciary capacities as noted above, will be referred to hereinafter as "Lagnese."

20.     The Jason Trust, the Jason Family Trust, the Jessica Family Trust, the Kenneth Trust II, the Kenneth Family Trust, the Kenneth, Jr. Family Trust, the Leslie Trust II, and the Leslie Family Trust will be referred to, collectively, hereinafter as the "Ciufo Trusts."

21.     Defendant ADMOR GROUP, INC. ("Admor Group") is and was, at all times relevant and material herein, a corporation organized and existing under the laws of the State of Hawaii, with its principal place of business in the City and County of Honolulu, State of Hawaii.

22.     Defendant ADMOR DISTRIBUTORS CORP. ("Admor Distributors") is and was, at all times relevant and material herein, a corporation organized and existing under the

4

laws of the State of Hawaii, with its principal place of business in the City and County of Honolulu, State of Hawaii.

23.     Defendant ADMOR HVAC PRODUCTS, INC. ("Admor HVAC") is and was, at all times relevant and material herein, a corporation organized and existing under the laws of the State of Hawaii, with its principal place of business in the City and County of Honolulu, State of Hawaii.

## IV.    FACTS COMMON TO ALL COUNTS

## A.    BACKGROUND

### The Ciufo Trusts

24.     On December 24, 1998, Leonard Ciufo ("Leonard"), father of Leslie and Kenneth, adoptive father and biological grandfather of Jason, and grandfather of Jessica and Kenneth, Jr., created the Ciufo Trusts, which were all irrevocable, for the benefit of his children and grandchildren with the assistance of the Ciufo family attorney, James Starshak, Esq. ("Starshak") of Carlsmith Ball, LLP in Honolulu, Hawaii.

25.     Three (3) of the eight (8) Ciufo Trusts—the Jason Trust, the Kenneth Trust II, and the Leslie Trust II (collectively, the "Mandatory Distribution Trusts")—provided for mandatory distributions of all income, at least quarterly, to its sole respective beneficiary.

26.     Leonard caused Jason, Kenneth, and Leslie to be the sole settlor of their respective Mandatory Distribution Trust. While he was alive, however, Leonard served as co-trustee with each of his children for their respective Mandatory Distribution Trust, despite his children being completely unaware of the mere existence of the Ciufo Trusts.

27.     The remaining five (5) of the eight (8) Ciufo Trusts—the Jason Family Trust, the Jessica Family Trust, the Kenneth Family Trust, the Kenneth Jr. Family Trust, and the

Leslie Family Trust (collectively, the "Discretionary Distribution Trusts")—provided for discretionary distributions of income to its sole respective beneficiary.

28.     Leonard was the settlor of the Discretionary Distribution Trusts, but he was neither a co-trustee nor a beneficiary of any of them.  Thus, Leonard had no legal authority to legally participate, directly or indirectly, in the administration of the Discretionary Distribution Trusts.

29.     Despite this fact, Leonard held himself out as a co-trustee and participated in the administration of the Discretionary Distribution Trusts, such that he was a de facto co-trustee in sole control of all of the Ciufo Trusts.

30.     Jason, Kenneth, and Leslie were co-trustees of their respective Discretionary Distribution Trust, however, Jessica and Kenneth, Jr. were minors when the Ciufo Trusts were created and could not serve as co-trustee and, therefore, were not named as co-trustees.

31.     Though Jason, Kenneth, and Leslie signed their respective Mandatory Distribution Trust as settlor and co-trustee and their respective Discretionary Distribution Trust as co-trustee, they did not understand what they were executing trust instruments and were completely unaware of the existence of the Ciufo Trusts.

32.     In fact, Jason, Kenneth, and Leslie were provided blank signature pages and were not even told they were executing trust instruments.

33.     No one took the time to explain to Jason, Kenneth, and Leslie what the purpose of the documents was or what their particular rights were under the instruments.

34.     They merely executed the trusts because Leonard and Starshak told them to do so.

6

35.     This practice of executing complex legal documents without explanation or understanding would continue on in other trust dealings in the future.

36.     In addition to the Ciufo Trusts, on or about October 30, 1992, Leonard created a revocable trust for himself, known as the Leonard L. Ciufo Trust.

37.     With the assistance of estate planning attorney, James Starshak, Esq. of Carlsmith Ball, LLP, Leonard restated and amended the Leonard L. Ciufo Trust by executing the First Restatement of the Leonard L. Ciufo Trust dated December 28, 1998 and the First Amendment to First Restatement of the Leonard L. Ciufo Trust dated July 21, 2006 (hereinafter collectively referred to as the "Leonard Ciufo Trust").

38.     Leonard died on October 29, 2008.

39.     The aggregate net worth of the Ciufo Trusts was approximately forty-five million dollars ($45,000,000) as of December 31, 2011.

40.     The following table summarizes the Ciufo Trusts:

| Table 1: Summary of the Ciufo Trusts | | | | | |
| --- | --- | --- | --- | --- | --- |
| Name of Trust | Date Executed | Settlor | Beneficiary | Original Trustees | Presently Serving Trustees |
| Jason Trust | 12/24/1998 | Jason | Jason | Leonard, Jason | Jason, Leslie, Lagnese |
| Jason Family Trust | 12/24/1998 | Leonard | Jason | Patrick Murphy ("Murphy"), Lori Forcucci ("Forcucci"), Jason | Jason, Leslie, Lagnese |
| Jessica Family Trust | 12/24/1998 | Leonard | Jessica | Murphy, Forcucci | Jessica, Jason, Lagnese |
| Kenneth Trust II | 12/24/1998 | Kenneth | Kenneth | Leonard, Kenneth | Kenneth, Leslie, Lagnese |
| Kenneth Family Trust | 12/24/1998 | Leonard | Kenneth | Murphy, Forcucci, Kenneth | Kenneth, Leslie, Lagnese |
| Kenneth Jr. Family Trust | 12/24/1998 | Leonard | Kenneth Jr. | Murphy, Forcucci | Kenneth, Jr., Kenneth, Lagnese |
| Leslie Trust II | 12/24/1998 | Leslie | Leslie | Leonard, Leslie | Leslie, Kenneth, Lagnese |
| Leslie Family | 12/24/1998 | Leonard | Leslie | Murphy, Forcucci, | Leslie, Kenneth, |

7

| Trust | | | | Leslie | Lagnese |
|-------|--|--|--|--------|---------|

## The Founding of the Ciufo Companies

41.     On or about October 27, 1971, Leonard incorporated Union Leasing ("Union Leasing"), under the laws of the State of Hawaii.

42.     On or about July 12, 1976, Leonard incorporated Admor Distributors under the laws of the State of Hawaii, for the purposes of wholesale and retail sale and installation of Frigidaire Refrigeration appliances.

43.     On or about March 24, 1995, Leonard incorporated Admor HVAC under the laws of the State of Hawaii for the purpose of selling commercial and residential air conditioning equipment.

44.     On or about February 15, 2000, Leonard established Ciufo Holding, under the laws of the State of Hawaii. While Leonard was alive, Ciufo Holding's only business purpose was to collect and distribute income owing to the Ciufo Trusts and invest trust principal instead of using individual accounts for each trust.

45.     On or about February 26, 2004, Leonard incorporated Admor Group for the purpose of recapitalizing Admor Distributors and Admor HVAC.

46.     Union Leasing, Admor Distributors, Admor HVAC, Ciufo Holding, and Admor Group will be referred to, collectively, hereinafter as the "Ciufo Companies."

## Control of the Ciufo Companies

47.     The following tables show the officers and directors of the Ciufo Companies before Leonard's death (prior to 2008), after Leonard's death (2008-2014) and presently.

8

## UNION LEASING

| Prior to 2008 | 2009-2014 | Present |
|---|---|---|
| Leonard - President, Secretary, and Director | Joanne Little ("Little") - President | Leslie - President, Treasurer, and Director |
| Kenneth - Vice President, Treasurer, and Director | Kenneth - Vice President, Treasurer, and Director | Kenneth - Vice President, Secretary, and Director |
| Leslie - Vice President and Director | Leslie - Vice President and Director | Lagnese - Assistant Secretary |
| | Georgina Fuerte ("Fuerte") - Secretary | Jason - Director |
| | Patrick Murphy ("Murphy") - Director | Jessica - Director |
| | | Kenneth Jr. - Director |

## ADMOR GROUP

| Prior to 2008 | 2009-2013 | 2014 | Present |
|---|---|---|---|
| Leonard - President, Secretary, and Director | Murphy - President and Director | Murphy - President and Director | Andrew Santos ("Santos") - President and Director |
| Fuerte - Vice President and Treasurer | Fuerte - Vice President, Treasurer, and Assistant Secretary | Little - Vice President and Director | Charles Young - Vice President and Director |
| | Little - Secretary | Fuerte - Secretary, Treasurer, and Director | Fuerte - Secretary, Treasurer, and Director |

9

## ADMOR DISTRIBUTORS

| Prior to 2008 | 2009-2012 | 2013-2014 | Present |
|---|---|---|---|
| Leonard - President, Secretary, and Director | Murphy - President | Murphy - President and Director | Fuerte - Treasurer, Secretary, and Director |
| Leslie - Vice President, Treasurer, and Director | Leslie - Vice President, Treasurer, and Director | Little - Vice President and Director | |
| | Fuerte - Secretary | Fuerte - Treasurer, Secretary, and Director | |
| | Little - Director | | |

## ADMOR HVAC

| Prior to 2008 | 2009-2013 | 2014 | Present |
|---|---|---|---|
| Andrew Santos ("Santos") - President | Andrew Santos ("Santos") - President | Andrew Santos ("Santos") - President | Santos - President |
| Fuerte - Vice President, Treasurer, and Director | Fuerte - Vice President, Treasurer, and Director | Little - Vice President and Director | Fuerte - Director |
| Leonard - Secretary and Director | Little - Secretary | Murphy - Secretary, Treasurer, and Director | |
| | Murphy - Director | Fuerte - Director | |

## CIUFO HOLDING

| Prior to 2008 | 2009-2014 | Present |
|---|---|---|
| Leonard - Manager | Little - Manager | Leslie - Manager |

48.     As evidenced in the tables above, while Leonard was alive, he solely controlled all of the Ciufo Companies as an officer, director, and/or manager of each.

49.     After Leonard's death, Murphy, Little, and Fuerte, through their trusteeship of the Ciufo Trusts, illegally inserted themselves into the Ciufo Companies without proper notice and without regard to any other corporate formalities.

50.     In fact, during these times of common control, corporate formalities were rarely, if ever, observed.

51.     The officers and directors of the Ciufo Companies failed to hold annual meetings, failed to properly document millions of dollars in interest-free loans between the Ciufo Companies, and failed to account to the shareholders and owners of the Ciufo Companies

52.     As a result, the Ciufos were unaware of the extent of the mismanagement of the Ciufo Companies until after they instituted their trustee removal actions against Murphy, Little, and Fuerte in 2012 (which will be discussed below).

53.     Presently, Admor Group, Admor Distributors, and Admor HVAC are controlled by Santos and Fuerte.

54.     At all times, then, Admor Group, Admor Distributors, and Admor HVAC have shared some form of common control and interest such that one person (Leonard, until his death in 2008) or groups of persons (Murphy, Little, Fuerte, and Santos and now, Santos and Fuerte) controlled and dictated the corporate activities of each company.[1]

55.     A corporation is imputed with constructive knowledge of the material facts known by its officers when acting in the course of employment and within the scope of his or her authority.[2]

56.     Therefore, as a result of this common control, Defendants Admor Group, Admor Distributors, and Admor HVAC were agents of each other and acted with the actual and/or apparent authority of each other and/or with the actual or constructive knowledge of each other.

---

[1] During all relevant times, Santos was the acting President of Admor HVAC.
[2] 3 Fletcher Cyc. Corp. § 790 (West 2014).

11

57. The acts complained of and described more fully herein were expressly or impliedly ratified by each of the Defendants Admor Group, Admor Distributors, and Admor HVAC.

58. Therefore, the Defendants Admor Group, Admor Distributors, and Admor HVAC should be held jointly and severally liable for all awards granted by this Court to Plaintiffs.

### The Trusts' Ownership of the Ciufo Companies

59. Leonard funded each of the Ciufo Trusts, with substantial cash and stock or membership interests in Admor Group, Union Leasing, and Ciufo Holding.

60. Leonard, at age 68, transferred approximately 80% of his personal wealth to the Ciufo Trusts, all of which were irrevocable.

61. By 2000, the Ciufo Trusts owned in the aggregate, 90% of Union Leasing, with the remaining 10% owned by the Leonard Ciufo Trust.

62. By 2002, the Ciufo Trusts owned, in the aggregate, 82% of Ciufo Holding, with the remaining 18% owned by the Leonard Ciufo Trust.

63. Leonard incorporated Admor Group in 2004 for the purpose of recapitalizing Admor Distributors and Admor HVAC, such that Admor Group became the parent company of Admor Distributors and Admor HVAC.

64. The recapitalization allowed the Trusts to sell the Admor Group stock to the Admor employees, including Leonard, using an employee stock ownership plan (the "Admor ESOP"), which will be more fully described below.

12

## The Admor Group ESOP – The 2004 ESOP Transaction

65.    By 2004, the Ciufo Trusts owned, in the aggregate, 82% of Admor Group, while the Leonard Ciufo Trust owned the remaining 18%.

66.    In March 2004, Leonard began step one of a two-step process in establishing the Admor ESOP: first, the Admor ESOP purchased 49% of the Admor Group shares, which was equal to approximately 2,254,000 shares, from the Ciufo Trusts and the Leonard Ciufo Trust (the "2004 ESOP Transaction").

67.    Similar to the execution of the Ciufo Trusts in 1998, Jason, Kenneth, and Leslie were again told to sign their respective Stock Pledge Agreements and the Stock Purchase Agreement without any explanation or understanding of what they were signing and why.

68.    Simply put, Jason, Kenneth and Leslie did not know that they ever owned Admor Group stocks let alone were part of an ESOP sale.

69.    This purchase was made in exchange for nine interest bearing promissory notes executed by Leonard and Murphy as the ESOP Plan Co-Administrators, as borrowers, in favor of the respective co-trustees of each of the Ciufo Trusts and the Leonard Ciufo Trust, as lenders, which together totaled the original principal amount of $5,000,000 (all nine promissory notes will be collectively hereinafter referred to as "ESOP Note 1").

70.    ESOP Note 1 was guaranteed by Admor Group and was repaid from Admor Group's business operation or redemption of the ESOP stock.

71.    ESOP Note 1 provided for an initial installment totaling approximately $73,000.00 divided proportionately among the Ciufo Trusts and the Leonard Ciufo Trust, followed by principal and interest payments to be made annually for seven years every April 15 until 2011.

13

72.     Commencing on April 19, 2004, however, Murphy and Leonard as Co-Plan Administrators of the Admor ESOP, and Admor Group, as guarantor, knowingly and intentionally began to make improper payments on ESOP Note 1 to Ciufo Holding, instead of the Ciufo Trusts and the Leonard Ciufo Trust.

73.     The loan payment schedules provided by the previous co-trustees show that from April 2004 through December 31, 2008, $5.382 million ($4.389 million in principal and $993,000 in interest) were impermissibly paid directly to Ciufo Holding rather than to the Ciufo Trusts and the Leonard Ciufo Trust.

### Additional Money Flows Back and Forth Between Admor Group and Ciufo Holding

74.     From 2004 to 2008, Leonard used Ciufo Holding as depository for income, which was immediately due and owing to the Trusts.

75.     Ciufo Holding was improperly pooling the ESOP Note 1 payments, rental income generated from Admor Distributors and Admor HVAC's lease of the Union Leasing warehouse, and dividend income from Admor Group, as well as other distributable income from the Ciufo Companies, otherwise owed to the Ciufo Trusts.

76.     Leonard withheld these amounts from the Ciufo Trusts because Ciufo Holding served as a funding source for Admor Group, Admor Distributors, and Admor HVAC.

77.     From 2004 to 2008, Leonard, as manager of Ciufo Holding, loaned interest-free, millions of dollars, otherwise owing to the Ciufo Trusts, to Admor Group and/or its subsidiaries for its benefit without reducing said loans to writing.

78.     Leonard, as president, secretary, and director, of Admor Group, personally benefitted from these interest-free loans at the expense of the Ciufo Trusts, for which Leonard serve as a de jure and de facto co-trustee.

14

79. Payments on these loans were sporadically made, but a balance remains when interest at the statutory rate of 10% per year is applied.

80. Ciufo Holding seeks repayment of these loans, plus interest, which should have properly been distributed to the Ciufo Trusts.

### The Admor Group ESOP – The 2007 ESOP Transaction

81. In 2007, the second step of the Admor ESOP process took place.

82. The remaining Admor shares in the Jason Family Trust, Kenneth Family Trust and Leslie Family Trust were transferred to their Mandatory Distribution Trust counterpart.

83. Then, on October 25, 2007, the Mandatory Distribution Trusts, the Jessica Family Trust, and the Kenneth, Jr. Family Trust sold their remaining 1,994,857 common non-voting shares of Admor Group to the Admor ESOP for a purchase price of $8,936,961 (the "2007 ESOP Transaction").

84. To facilitate the 2007 ESOP Transaction, Admor Group loaned the $8,936,961 purchase price to the Admor ESOP.

85. Precisely $8,500,000 of the purchase price, however, was loaned by Ciufo Holding to Admor Group, as evidenced by a ten-year interest bearing promissory note in the original principal amount of $8,500,000 dated November 9, 2007, executed by Leonard, as President of Ciufo Holding (lender) and as President of Admor Group (borrower) ("ESOP Note 2").

86. Ciufo Holding was collecting the principal and interest payments from ESOP Note 1 that should have properly been paid to the Ciufo Trusts and the Leonard Ciufo Trust.

15

87.     Of the ESOP Note 1 money diverted to Ciufo Holding, $4.575 million of the Ciufo Trusts' money was transferred back to Admor Group, which was then used to pay the Ciufo Trusts for the 2007 ESOP Transaction.

88.     It was further discovered in mid-2013 that Ciufo Holding was also improperly pooling and withholding Ciufo Trust income from other sources, including, but not limited to Union Leasing rental income, other Admor Group income, and Ciufo Holding investment income.

89.     Therefore, the majority of the $8,500,000 loaned by Ciufo Holding to Admor Group and then later by Admor Group to the Admor ESOP to purchase the remaining shares was largely comprised of the Ciufo Trusts' own income.

90.     Essentially, then, the Admor ESOP purchased the remaining Admor Group shares of the Mandatory Distribution Trusts, the Jessica Family Trust, and the Kenneth, Jr. Family Trust with these trusts' own money.

91.     Unlike the 2004 ESOP Transaction, Leonard did not have Jason, Kenneth, or Leslie sign any of the documents in the 2007 ESOP Transaction.

92.     The 2007 ESOP Transaction was completed entirely by Leonard, without the knowledge or consent of the Ciufos; and, in fact, Leonard was the only one to sign almost all of the documents.[3]

93.     Leonard executed these various documents to complete the 2007 ESOP Transaction in the following capacities:

    a.  As president and secretary of Admor Group;

    b.  As trustee of the Admor ESOP;

---

[3] Only one other document was signed by Patrick Murphy, Georgina Fuerte, and Liberato Saquing as ESOP Committee Members.

16

    c.  As president of Ciufo Holding;

    d.  As co-trustee of the Jason Trust;

    e.  As co-trustee of the Kenneth Trust II;

    f.  As co-trustee of the Leslie Trust II;

    g.  As co-trustee of the Jessica Family Trust; and

    h.  As co-trustee of the Kenneth Jr. Family Trust.

94.    The most alarming aspect of the 2007 ESOP Transaction is that Leonard was not actually a co-trustee of either the Jessica Family Trust or the Kenneth Jr. Family Trust when their respective remaining shares were sold to the Admor ESOP.

## Information Regarding the Ciufo Trusts and the Ciufo Companies Is Withheld from the Ciufos

95.    Prior to Leonard's death, the Ciufos did not know anything about the Ciufo Trusts, despite the fact that Jason, Kenneth, and Leslie were co-trustees of their respective trusts.

96.    From the Ciufo Trusts' inception to Leonard's death, Jason, Kenneth, and Leslie were told merely to sign various documents as co-trustee, without any explanation as to what the documents were or what they meant.

97.    At the time the Ciufo Trusts were executed, Jessica and Kenneth Jr. were minors and could not serve as co-trustees and during all other relevant times Jessica and Kenneth Jr. were minors, so they were not asked or required to sign any documents.

98.    After Leonard's death, the Ciufos were given very little additional information on their respective Ciufo Trusts until late 2012 when information was obtained in the litigation's discovery process.

99.　　The Ciufos knew nothing about the Ciufo Trusts or its assets, including their respective interests in the Ciufo Companies.

100.　　Murphy, a friend of Leonard's, who served as a co-trustee of the Discretionary Distribution Trusts from their inception, also became a co-trustee of the Mandatory Distribution Trusts upon the death of Leonard.

101.　　Fuerte, Leonard's long-time bookkeeper for the Ciufo Companies, and Little, a distant relative of Leonard's deceased wife, also became co-trustees of the Discretionary Distribution Trusts in April of 2002 and the Mandatory Distribution Trusts upon the death of Leonard.

102.　　The Ciufos struggled to obtain information from Murphy, Little, Fuerte, and Starshak.

103.　　Murphy, Little, and Fuerte, as co-trustees of the Ciufo Trusts, never provided the Ciufos with a complete accounting of their respective Trust assets.

104.　　Furthermore, the Ciufos were also not properly kept apprised of the business dealings of the Ciufo Companies, despite the fact that Kenneth and Leslie were officers and directors of some of them during Leonard's lifetime.

105.　　As mentioned previously, after Leonard's death, Murphy, Little, and Fuerte inserted themselves into the various Ciufo Companies by voting themselves in as officers and directors by virtue of the shares they held in the Ciufo Companies as co-trustees of the various Ciufo Trusts, without any formal shareholder meeting.

106.　　Sensing that they needed help, the Ciufos sought the guidance and advice of their uncle, Lagnese, and, eventually, obtained legal counsel.

18

107.    First, a proceeding regarding the Leonard Ciufo Trust was opened to determine how the residuary trust estate should be distributed.

108.    Pursuant to sections 5.03 and 5.04 of the Leonard Ciufo Trust, the Discretionary Distribution Trusts were the beneficiaries of the residuary trust estate of the Leonard Ciufo Trust.

109.    Pursuant to an Order of the Probate Court of the First Circuit State of Hawaii filed August 18, 2011 in the case entitled, *In the Matter of the Leonard L. Ciufo Trust Dated October 30, 1992, Restated December 31, 1998, as Amended July 12, 2006*, T. No. 09-1-0748 (the "Court Order"), the residuary trust estate was to be distributed amongst the Discretionary Distribution Trusts in equal shares.

110.    By December 31, 2011, the 18% of the stock of Ciufo Holding, the 10% of the issued stock in Union Leasing, and 8% of the stock of Admor Group, all previously owned by the Leonard Ciufo Trust, were distributed in equal shares to the Discretionary Distribution Trusts, pursuant to the Court Order.

111.    Thus, the Ciufo Trusts now own 100% of the membership interests in Ciufo Holding and 100% of the outstanding stock of Union Leasing.

112.    The Discretionary Distribution Trusts own the remaining approximate 8% of shares in Admor Group, not owned by the Admor ESOP.

113.    The Ciufo Trusts ownership interests in Union Leasing, Ciufo Holding, and Admor Group, as of 2011, following the Court Order are as follows:

| Table 2: Ciufo Companies Shareholder Ownership Interests as of 2011 (Rounded) | | | |
|---|---|---|---|
| | Union Leasing | Ciufo Holding | Admor Stock |
| Leslie Ciufo Trust | 24% | 22% | 0% |
| Leslie Family Trust | 4% | 7% | 1.6% |
| Kenneth Ciufo Trust | 34% | 24% | 0% |
| Kenneth Family Trust | 4% | 6% | 1.6% |
| Jason Ciufo Trust | 9% | 9% | 0% |
| Jason Family Trust | 4% | 6% | 1.6% |
| Jessica Family Trust | 13% | 15% | 1.6% |
| Kenneth Jr. Family Trust | 8% | 11% | 1.6% |
| Total | 100% | 100% | 8.0% |

114.   Eventually, the Ciufos discovered various breaches of fiduciary duty by Murphy, Little, and Fuerte and filed  petitions for each Ciufo Trust to remove them as co-trustees in August 2012 in the probate court of the First Circuit Court, State of Hawaii.

115.   As a result of the petitions, Murphy, Little, and Fuerte removed Kenneth and Leslie as officers and directors without proper notice to Kenneth and Leslie.

116.   Furthermore, it was only through the discovery process of the litigation, from 2013 to 2014, that Lagnese was able to piece together the various transactions between the Ciufo Trusts and the Ciufo Companies, as described above.

117.   After years of litigation, the parties settled the lawsuit resulting in Murphy, Little, and Fuerte resigning as co-trustees of the Ciufo Trusts and the Ciufos and Lagnese becoming co-trustees as set forth in Table 1 above.

118.   In the past several months, Lagnese was able to review the books and records of Union Leasing and Ciufo Holding.

20

119.    A request was made to Fuerte, to provide Lagnese with all outstanding amounts due and owing by Admor Group, Admor Distributors, and Admor HVAC to Union Leasing, Ciufo Holding, and the Ciufo Trusts.

120.    Despite this request, Fuerte has not provided such information, but rather, upon John's discovery of additional amounts owing to Union Leasing, Fuerte resigned as the bookkeeper for Union Leasing and Ciufo Holding.

121.    A request was made to Fuerte, to provide Lagnese with all outstanding amounts due and owing by Admor Group, Admor Distributors, and Admor HVAC to Union Leasing, Ciufo Holding, and the Ciufo Trusts.

## V.    CAUSES OF ACTION

### COUNT I – UNJUST ENRICHMENT
(PLAINTIFF CIUFO HOLDING AS TO ALL DEFENDANTS - LOANS MADE BY CIUFO HOLDING TO ADMOR DISTRIBUTORS AND ADMOR HVAC FROM 2004-2008)

122.    Plaintiffs repeat and reallege all of the allegations set forth in paragraphs 1 through 121 of the Complaint as though fully set forth herein.

123.    From 2004-2008, when Leonard was still alive, he, as manager of Ciufo Holding, loaned millions of dollars in interest-free loans to Admor Distributors, of which Leonard served as president, secretary, and director, and Admor HVAC, of which Leonard served as secretary and director.

124.    "One who receives a benefit is of course enriched, and he would be unjustly enriched if its retention would be unjust.  And it is axiomatic that 'a person who has been unjustly enriched at the expense of another is required to make restitution to the other.'" Small v. Badenhop, 67 Haw. 626, 636, 701 P.2d 647, 654 (1985).

21

125.    The loans benefitted Defendants Admor Group, Admor Distributors, and

Admor HVAC by financing their operations.

126.    The loans also benefitted Leonard, personally, as he drew a salary and

bonuses as an employee of Admor Group.

127.    Below is a summary of the loan amounts and the repayments made

between Ciufo Holding and Admor Group, Admor Distributors, and/or Admor HVAC:

| Date | Loan Amount | Loan Repayment | Balance |
|---|---|---|---|
| 1/13/2004 | $   1,000,909.00 | | $   1,000,909.00 |
| 3/17/2004 | $      301,456.00 | | $   1,302,365.00 |
| 4/29/2004 | | $      (314,017.00) | $      988,348.00 |
| 5/17/2004 | $      200,000.00 | | $   1,188,348.00 |
| 5/28/2004 | | $   (1,095,000.00) | $        93,348.00 |
| 6/3/2004 | $      819,352.00 | | $      912,700.00 |
| 7/19/2004 | $        71,718.00 | | $      984,418.00 |
| 7/21/2004 | $        98,176.00 | | $   1,082,594.00 |
| 12/1/2004 | | $      (520,000.00) | $      562,594.00 |
| 12/8/2004 | | $      (250,000.00) | $      312,594.00 |
| 12/27/2004 | | $      (350,958.00) | $        (38,364.00) |
| 1/4/2005 | $   1,400,000.00 | | $   1,361,636.00 |
| 9/30/2005 | $      200,000.00 | | $   1,561,636.00 |
| 10/26/2005 | | $      (300,000.00) | $   1,261,636.00 |
| 1/9/2006 | $      800,000.00 | | $   2,061,636.00 |
| 1/26/2006 | $      920,000.00 | | $   2,981,636.00 |
| 2/14/2006 | | $   (1,000,000.00) | $   1,981,636.00 |
| 4/20/2006 | $      100,000.00 | | $   2,081,636.00 |
| 6/9/2006 | | $      (750,000.00) | $   1,331,636.00 |
| 8/17/2006 | | $      (520,000.00) | $      811,636.00 |
| 8/25/2006 | | $      (520,000.00) | $      291,636.00 |
| 9/15/2006 | | $        (80,000.00) | $      211,636.00 |
| 12/20/2006 | $   1,063,760.00 | | $   1,275,396.00 |
| 12/22/2006 | | $      (423,000.00) | $      852,396.00 |
| 1/2/2007 | $      250,000.00 | | $   1,102,396.00 |
| 3/15/2007 | $      283,000.00 | | $   1,385,396.00 |
| 3/30/2007 | $   1,600,000.00 | | $   2,985,396.00 |
| 6/20/2007 | | $      (450,000.00) | $   2,535,396.00 |
| 11/16/2007 | | $   (2,163,041.00) | $      372,355.00 |

22

| 1/4/2008 | $ 1,000,000.00 | | | $ | 1,372,355.00 |
| 10/31/2013 | | $ | (1,404,429.00) | $ | (32,074.00) |
| | $ 10,108,371.00 | $ | (10,140,445.00) | | |

128.    Admor Group, Admor Distributors, and Admor HVAC made sporadic payments, but the Defendants have not paid off the entire loan amount because Ciufo Holding is entitled to interest at the statutory rate of 10% per year pursuant to Hawaii Revised Statutes § 478-2 and said interest has been accruing since the first loan was made on January 13, 2004.

129.    In 2013, over five years after the last loan was made by Ciufo Holding, Admor Group and/or its subsidiaries made a repayment of $1,404,429.00, which was $32,074.00 in excess of the principal amount of the loans owed.

130.    The overpayment was an acknowledgment by Admor Group, Admor Distributors, and Admor HVAC that interest was in fact accruing on the principal amounts.

131.    However, the additional $32,074.00 does not fully satisfy the amount of interest that accrued over the eleven year period from 2004 to present.

132.    To the extent that the loan principal and interest remains unpaid, Admor Group and its subsidiaries have been unjustly enriched to the detriment of Plaintiff Ciufo Holding and, ultimately, Plaintiff Co-Trustees of the Ciufo Trusts, as owners of Ciufo Holding.

133.    Though these loans occurred between 2004 and 2008, Plaintiffs did not discover these loans and the resulting detriment to Plaintiffs' interests until after the Ciufos filed their trustee removal action in 2012 because Plaintiffs were never properly informed of the of finances of the Ciufo Companies or given any type of trust accounting.

134.    Plaintiffs seek restitution of principal loaned and the legal rate of interest at 10% accrued pursuant to HRS § 478-2 that has not yet been repaid in an amount to be proven at trial.

23

135.    Defendants Admor Group, Admor Distributors, and Admor HVAC should

be jointly and severally liable to the Ciufo Trusts because of their common control and interest.

## COUNT II – UNJUST ENRICHMENT
(PLAINTIFF CO-TRUSTEES AS TO ALL DEFENDANTS – AMOUNTS IMPROPERLY
POOLED AND WITHHELD IN CIUFO HOLDING FOR THE BENEFIT OF ADMOR
GROUP, ADMOR DISTRIBUTORS, AND ADMOR HVAC FROM 2004-2007)

136.    Plaintiffs repeat and reallege all of the allegations set forth in paragraphs 1

through 135 of the Complaint as though fully set forth herein.

137.    Also from 2004-2007, Leonard, as manager of Ciufo Holding, improperly

and secretly pooled money in Ciufo Holding and withheld the same from the Ciufo Trusts for the

sole and exclusive benefit of Defendants Admor Group, Admor Distributors, and Admor HVAC,

each of which Leonard was an officer and director.

138.    In doing so, Ciufo Holding became the principal funding source for

Admor Group, Admor Distributors, and Admor HVAC, which benefited the Defendant

companies by providing quick and easy access to cash if and when the Defendant companies

needed it.

139.    As Ronald Baldwin ("Baldwin"), Leonard's accountant, stated in a memo

dated October 17, 2009 to the Ciufos: "It is not possible to remove funds from either Ciufo

Holding[] or Union Leasing.  Ciufo Holding[] needs to remain liquid since it is the principal

backup funding for Admor operations and the payment by the Admor ESOP of the note due the

Trusts from the sale of Admor stock."[4]

140.    The money pooled in Ciufo Holding was trust income derived from other

sources which should have been periodically distributed to the Ciufo Trusts due to the

beneficiaries since at least 2004.

---

[4] Attached hereto as **Exhibit "A"** is a true and correct copy of the memo written by Baldwin dated October 17, 2009.

141. However, under Leonard's scheme, Ciufo Holding was not able to properly distribute the amounts in case Admor Group, Admor Distributors, or Admor HVAC required the funds.

142. As a result, amounts properly due and owing to the Ciufo Trusts sat in Ciufo Holding's non-interest bearing bank account and the Ciufo Trusts lost the opportunity to invest and earn interest on these amounts.

143. Though this pooling occurred between 2004 and 2007 and Baldwin wrote his memo in 2009, Plaintiffs did not discover that the money pooled in Ciufo Holding was actually trust income, wrongfully withheld, until after the Ciufos filed their trustee removal action in 2012 because Plaintiffs were never properly informed of the finances of the Ciufo Companies or given any type of trust accounting.

144. Plaintiff Co-Trustees of the Ciufo Trusts seek payment of the statutory legal rate of interest at 10% per year upon the amounts improperly pooled in Ciufo Holding and never distributed to the Ciufo Trusts in an amount to be proven at trial.

145. Defendants Admor Group, Admor Distributors, and Admor HVAC should be jointly and severally liable to the Ciufo Trusts because of their common control and interest.

**COUNT III – UNJUST ENRICHMENT**
(PLAINTIFF CO-TRUSTEES AS TO ALL DEFENDANTS – AMOUNTS IMPROPERLY POOLED AND WITHHELD IN CIUFO HOLDING AND UNION LEASING FOR THE BENEFIT OF ADMOR GROUP, ADMOR DISTRIBUTORS, AND ADMOR HVAC FROM 2008-2014)

146. Plaintiffs repeat and reallege all of the allegations set forth in paragraphs 1 through 145 of the Complaint as though fully set forth herein.

147. In 2008, after Leonard's death, Murphy, Little, and Fuerte took over control of the Ciufo Companies.

25

148.     As officers and/or directors of Admor Group, Admor Distributors, and Admor HVAC, Murphy, Little, and Fuerte continued Leonard's practice of pooling trust income in Ciufo Holding for the benefit of the Admor Group, Admor Distributors, and Admor HVAC.

149.     From 2008-2014, Little was the managing member of Ciufo Holding and Murphy, Little, and Fuerte were members by virtue of their co-trusteeship of the Ciufo Trusts which owns 100% of Ciufo Holding.

150.     By pooling the money owed to the Ciufo Trusts in Ciufo Holding, Murphy, Little, and Fuerte benefitted Admor Group, Admor Distributors, and Admor HVAC to the detriment of the Ciufo Trusts, of which Murphy, Little, and Fuerte were co-trustees.

151.     Similar to the amounts pooled between 2004 and 2007, amounts properly due and owing to the Ciufo Trusts from 2008 to 2014 sat in Ciufo Holding's non-interest bearing bank account and the Ciufo Trusts lost the opportunity to invest and earn interest on these amounts.

152.     Though this pooling began in 2008, Plaintiffs did not discover that the money pooled in Ciufo Holding was actually trust income, wrongfully withheld, until after the Ciufos filed their trustee removal action in 2012 because Plaintiffs were never properly informed of the of finances of the Ciufo Companies or given any type of trust accounting.

153.     Plaintiff Co-Trustees of the Ciufo Trusts seek payment of the legal rate of interest at 10% per year upon the amounts improperly pooled in Ciufo Holding and never distributed to the Ciufo Trusts in an amount to be proven at trial.

154.     Defendants Admor Group, Admor Distributors, and Admor HVAC should be jointly and severally liable to the Ciufo Trusts because of their common control and interest.

## VI. **PRAYER FOR RELIEF**

Wherefore, based on the foregoing, Plaintiffs respectfully request this Honorable Court grant the following requests for relief:

A.  As to Count I: That the Court award Plaintiff Ciufo Holding judgment against Defendants Admor Group, Admor Distributors, and Admor HVAC, jointly and severally, for principal and interest at the statutory legal rate of 10% per year for money loaned by Ciufo Holding to Admor Distirbutors and Admor HVAC between 2004 and 2008 that have not yet been repaid in an amount to be proven at trial;

B.  As to Count II: That the Court award Plaintiff Co-Trustees of the Ciufo Trusts judgment against Defendants Admor Group, Admor Distributors, and Admor HVAC, jointly and severally, for interest at the statutory legal rate of 10% per year upon the amounts improperly pooled in Ciufo Holding and never distributed to the Ciufo Trusts between 2004 and 2007 in an amount to be proven at trial;

C.  As to Count III: That the Court award Plaintiff Co-Trustees of the Ciufo Trusts judgment against Defendants Admor Group, Admor Distributors, and Admor HVAC, jointly and severally, for interest at the statutory legal rate of 10% per year upon the amounts improperly pooled in Ciufo Holding and never distributed to the Ciufo Trusts between 2008 and 2014 in an amount to be proven at trial;

D.  As to all Counts: That this Court award Plaintiffs their attorneys' fees and costs; and

27

E.    As to all Counts: That this Court grants any and all other relief, as it deems

just and proper.

DATED: Honolulu, Hawaii;    APR 1 3 2015

MICHAEL D. RUDY
CHERYL R. NG
PAUL A. C. HIGA
Attorneys for Plaintiffs

To the Ciufo Beneficiaries:

Re: $2 million loan proposal for Ciufo Estate Tax payment.

Regarding the October 11, 2009 letter pertaining to the above referenced subject, it seems that my explanation of the proposal was incomplete since there is so much misunderstanding of the plan and its consequences. It is important to note the following:

1. The $250,000 loan from certain Trusts on July 29th 2009 was a temporary loan from the Trusts that will be repaid and is not the same as the $2 Million margin loan facility being advised.

2. The $2 Million margin loan facility does not remove assets from the Trust accounts nor does it "put any constraint on the Trusts" that does not already exist. Funds for the loan are borrowed from a third party only using the San Francisco Bond assets in the Trusts as collateral. It is a nonrecourse borrowing. Cost of the borrowing will be paid by the Ciufo Estate, not the Trusts, by full reimbursement of the Trust margin costs. This borrowing facility was established by Leonard for the purposes of providing liquidity to the Trusts and for required diversification of Trust investments. The margin loan facility should be used as soon as possible.

3. The San Francisco Bond assets in the Trusts all arose from the sale of Admor stock by the Trusts to the Admor ESOP. The Trusts elected not to pay the approximate $1.6 Million federal and state income taxes otherwise due from the sale. Therefore, there is an additional $1.6 Million of assets in these accounts. It is suggested that the Trusts use this excess to temporarily fund part of the Estate tax by using the margin borrowing facility created for this and other purposes. The Ciufo Estate funded about $4 Million of the Trusts sale proceeds from the Admor stock sale. That is why the Ciufo estate has a $3.4 Million receivable from Ciufo Holdings, the entity used to facilitate the sale. The proposal merely suggests using the Trusts borrowing capacity provided by the estate at the time of the ESOP sale to temporarily fund its Estate tax because Leonard's' death occurred before Admor could reimburse the Estate for the $4 Million funding. The proposal provides that the Trusts would hold the $3.4 Million estate asset as collateral for the use of its loan margin loan facility.

4. Selling Estate marketable securities to pay the Estate tax results in a cost, namely, the loss of income from these securities. This should be measured against the cost of borrowing the funds. In this case the securities to be sold are largely double tax-free tax exempt bonds yielding 5% net of tax income. The Trust margin borrowing facility is presently at a tax deductible rate of only 3.25% p.a.. The ultimate cost to the Ciufo family of selling securities rather than using the facility is about 3% per annum or $60,000 per year for the $2 Million facility. There are not sufficient securities in the Estate to provide the $2.2 Million additional tax due if the margin facility is not used

5. Using the loan facility results in reducing the Estate tax by about $200,000 since the interest cost can be deducted in determing the estate tax in full at the time of filing the Estate tax return.

6. It is not possible to remove funds from either Ciufo Holdings or Union Leasing. Ciufo Holdings needs to remain liquid since it is the principal backup funding for Admor operations and the payment by the Admor ESOP of the notes due the Trusts from the sale of Admor stock. All available Union Leasing funds were used to purchase the Ciufo residence from the estate which were then used by the Estate to pay a portion of the Estate tax.

7. Over the suggested four year period, use of the margin facility will reduce estate taxes by $200,000 and preserve $400,000 of tax free income at a net of tax interest cost of about $160,000 for a net saving of $440,00. Selling Estate assets to pay the remaining estate tax will cost the family at least $400,000 over the same period

RP Baldwin

October 17, 2009

Exhibit "A"